# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **LARRY S. WHITE,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-2262-DDC-KGG** |
| **CERTAINTEED CORPORATION,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Larry S. White filed a five-count civil action against defendant CertainTeed Corporation, advancing claims of discrimination and retaliation under the Americans with Disabilities Act (ADA), Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981. Before the court are three motions filed by CertainTeed: (1) Motion to Strike Plaintiff's Untimely Amended Rule 26 Disclosures (Doc. 34); (2) Motion for Summary Judgment (Doc. 37); and (3) Motion to Strike Plaintiff's Opposition Exhibits 13, 16, 17, 22, and 23 (Doc. 44). The court grants in part and denies in part CertainTeed's Motion to Strike Plaintiff's Opposition Exhibits, excluding Exhibits 13, 16, 17, and 23 from consideration and partially excluding Exhibit 22 from consideration. The court also grants CertainTeed's Motion for Summary Judgment, concluding Mr. White has failed to sustain his burden under the *McDonnell Douglas*[1] framework, and its hybrids, on any of his claims. Finally, the court denies CertainTeed's Motion to Strike Plaintiff's Untimely Amended Rule 26 Disclosures because the summary judgment entered by this Order renders this motion moot.

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

## I.    Uncontroverted Facts

The following facts either are uncontroverted or, where controverted, they are stated in the light most favorable to Mr. White as the non-moving party.

### A.    Mr. White's Employment at CertainTeed

Mr. White, who is African-American, commenced employment at CertainTeed in July 1998.  Doc. 33 at 2–3 (Pretrial Order at ¶¶ 2.a.4, 2.a.7).  CertainTeed "manufactures interior and exterior building products" and "operates a fiberglass insulation manufacturing facility in Kansas City, Kansas."  *Id.* at 2 (Pretrial Order at ¶¶ 2.a.1–2.a.2).  By 2001, Mr. White assumed the position of Utility Cullet.  Doc. 43-11 at 6 (White Dep. 15:13–17).  As a Utility Cullet, Mr. White's job duties included:  (1) "[m]aintain[ing] a safe and clean work area," (2) "make[ing] proper adjustments to all process equipment," (3) cleaning and removing scrap fiber from machinery in his area, (4) cleaning the washwater area, including the screens in the washwater system, and (5) transporting cullet to other areas of the plant.  Doc. 43-5 at 3–5, 7.  CertainTeed employees worked in shifts.  Doc. 38-3 at 3 (Perrier Decl. ¶ 10).  Mr. White worked Shift A, a shift followed by Shift D.  *Id.*  Mr. White, like all CertainTeed employees, was subject to the Plant Conduct Rules, including Rule 9, which addressed "[p]oor job performance or errors in performing assigned tasks."  Doc. 38-8 at 2.  Finally, Mr. White, like other production employees at CertainTeed's Kansas City plant, was a member of the Teamsters Local 41 Union (the "Union").  Doc. 33 at 3 (Pretrial Order at ¶ 2.a.9).  And, under the Union's Collective Bargaining Agreement and CertainTeed's progressive disciplinary process, a Rule 9 violation justified termination only when it was the employee's third written notice of a Rule 9 violation within a nine- or twelve-month period.  Doc. 43-6 at 5, 8 (Billings Dep. 13:8–12, 27:22–28:4).

In 2013 or 2014, Mr. White's doctor diagnosed him with a restrictive airway condition.[2] *Id.* at 61–62 (Billings Dep. 236:23–237:5). At that time, and for some time preceding his diagnosis, Mr. White often took it upon himself to wear a half-face respirator mask when working. *Id.* at 62–63 (Billings Dep. 240:12–242:8). In 2015, CertainTeed moved Mr. White from the K-11 line to the K-21 line. Doc. 43-11 at 6 (White Dep. 16:7–13). Also during 2015, CertainTeed stopped offering employees unfettered access to half- and full-face respirator masks. Doc. 38-10 at 10 (Shelly Dep. 41:16–22).

In February 2015, Mr. White underwent an x-ray of his chest, which revealed nodules in his lung. Doc. 43-11 at 62 (White Dep. 239:12–14). Mr. White's doctor recommended he wear a full-face respirator mask. Doc. 38-10 at 11 (Shelly Dep. 47:4–11). Clay Shelly and Thomas Weigert—the Environmental, Health, Safety, and Security Manager and the Plant Manager respectively—learned about Mr. White's breathing condition and that he was donning a respirator mask. *Id.* at 5, 11 (Shelly Dep. 13:6–9, 47:7–21); Doc. 33 at 3 (Pretrial Order at ¶ 2.a.6); Doc. 38-7 at 12, 76 (White Dep. 162:8–18, 296:7–10). Mr. Shelly questioned Mr. White's need for a mask, expressing concern that the mask might further restrict Mr. White's airways and might impair Mr. White's line of sight and ability to perform some of his job duties safely. Doc. 38-10 at 11–12 (Shelly Dep. 48:13–49:8); *see id.* at 44 (e-mail from Mr. Shelly indicating it might not be safe for Mr. White to operate a fork lift while wearing a mask). Mr. Shelly advised Mr. White he could not wear a half- or full-face respirator mask until: (1) he provided a doctor's note, (2) CertainTeed conducted a hazard assessment, (3) he underwent a fit

---

[2]     Other aspects of the papers on summary judgment suggest Mr. White did not experience breathing problems until 2015. *See* Doc. 43 at 62 (Plaintiff's Statement of Additional Uncontroverted Facts at ¶ 56) ("In early 2015, Mr. White began experiencing breathing problems."). Discrepancies over when Mr. White first experienced breathing problems and when he first alerted CertainTeed of these breathing problems are not material to resolving CertainTeed's Motion for Summary Judgment.

test, and (4) he received training on how to wear the mask.  *Id.* at 12 (Shelly Dep. 49:23–50:4); *see also id.* at 41 (Mr. Shelly's notes from meeting with Mr. White).  Mr. Shelly also scheduled Mr. White for an appointment with the plant physician.  *Id.* at 12 (Shelly Dep. 49:18–20).

A few days later, and before Mr. White provided Mr. Shelly with a note from his doctor, Mr. Shelly saw Mr. White wearing a full-face respirator mask.  *Id.* at 14 (Shelly Dep. 62:7–63:1).  Mr. Shelly sent Mr. White home for the day.  *Id.*  Five days later, Mr. White dropped off a doctor's note.  *Id.* (Shelly Dep. 63:18–64:3).  It read: "I have asked him to wear protective equipment and have recommended a full-face mask with filters as a precaution."  *Id.* (Shelly Dep. 63:18–64:3).  Mr. Shelly deemed the note too vague to advance Mr. White's request to wear a respirator mask because the note did not elaborate on Mr. White's breathing condition, the type of pollutants causing the breathing condition (fumes, dust, water vapor, etc.), or identify what type of mask and filter the doctor recommended.  *Id.* at 14, 17 (Shelly Dep. 64:15–18, 74:16–75:6).  Mr. Shelly contacted John Monroe, the Shift A supervisor, and advised him that Mr. White could not wear a half- or full-face mask until he had provided an adequate note from a doctor.  *Id.* at 15 (Shelly Dep. 67:13–18); *see also id.* at 44 (e-mail from Mr. Shelly to Mr. Monroe).  Mr. Monroe sent Mr. White home.  Doc. 38-6 at 6 (Monroe Dep. 24:15–17).

Nothing in the record suggests Mr. White produced a doctor's note that satisfied Mr. Shelly; but Mr. White did return to work.  Later in February, Mr. Shelly saw Mr. White with a half-face respirator mask hanging around his neck and required him to put it away.  Doc. 38-10 at 18 (Shelly Dep. 80:11–25).  After that conversation, Mr. Shelly never saw Mr. White wearing a half- or full-face respirator mask.  *Id.* at 19 (Shelly Dep. 83:1–9).  And, according to Mr. White, he stopped wearing a half- or full-face respirator mask around May 2015 and did not

ask Mr. Shelly again about wearing a mask.  Doc. 43-11 at 68 (White Dep. 261:5–262:7); Doc. 38-7 at 31 (White Dep. 323:11–324:12).[3]

In fall 2015, Julien Perrier, the Plant Superintendent, began receiving complaints from Shift D employees about Mr. White's job performance and the state of the washwater area following Shift A.  Mr. Perrier determined that, on November 1, 2015, the K-21 washwater system, which Mr. White staffed during the overnight shift, was not ready for operation to start the production line on time.  Doc. 38-2 at 8 (Perrier Dep. 69:5–22).  Mr. Perrier instructed Mr. Monroe to issue a write-up notice to Mr. White for poor job performance, in violation of Rule 9.  *Id.* (Perrier Dep. 69:5–22).  Mr. Monroe issued the write-up.  Doc. 38-14.  Mr. Monroe, however, expressed reservation to Mr. White about issuing a write-up based on hearsay.  Doc. 43-22 at 6 (Transcript of Audio Recording at 17:14–25).[4]  He also told Mr. White that he believed the plows, not the washwater system, prevented the line from starting production on time.  *Id.* at 4 (Transcript of Audio Recording at 11–17).  And, when receiving the write-up, Mr. White asked Mr. Monroe who the plant human resources person was because he wanted to file a claim of harassment.  *Id.* at 8 (Transcript of Audio Recording at 25:8–24).  But, Mr. White did not provide specifics to Mr. Monroe about the basis for his claim of harassment, *i.e.*, race, disability, or national origin.  *See id.* (*See* Transcript of Audio Recording at 25:18–26:7).

---

[3]     The court cites two versions of Mr. White's deposition because, although Mr. White's Statement of Additional Uncontroverted Facts cites to testimony from the second day of his deposition, Mr. White did not attach a transcript of that testimony to his Response to the summary judgment motion.  Instead, only excerpts of his second-day testimony appear in CertainTeed's papers in support of summary judgment.  And, although CertainTeed pointed out Mr. White's omission in its Reply on summary judgment, Mr. White did not move for leave to submit the missing deposition testimony.  The court thus cannot evaluate or accept the additional statements of fact advanced by Mr. White that rely on second-day testimony not included in the excerpts submitted by CertainTeed.

[4]     Section II.A.2. of this order addresses the court's ability to consider this transcript for purposes of summary judgment.

Instead, Mr. White merely mentioned some ways in which he believed he was treated differently than other utility cullets. *See id*. (*See* Transcript of Audio Recording at 25:18–25:24).

On November 26, 2015, Mr. Perrier and Paul Hughes, the Shift D supervisor, received an e-mail from a second-level supervisor on Shift D entitled, "K21 WW – Larry White Aftermath!." Doc. 38-5 at 9. The e-mail included pictures of the unkempt state of the washwater area at the start of Shift D. *Id.* A little more than two weeks later, on December 13, 2015, Mr. Hughes received another report about the state of the washwater area following Mr. White's shift and, after inspecting the area himself, prepared a Rule 9 write-up for Mr. White. Doc. 38-5 at 4–5 (Hughes Decl. ¶¶ 19–20, 24). And, on December 16, 2015, Mr. Perrier received another complaint from Shift D workers about the state of the washwater area following Mr. White's shift. Doc. 38-3 at 5 (Perrier Decl. ¶ 21). In response to this complaint, Mr. Perrier drafted a Rule 9 write-up for Mr. White and spoke with Mr. Hughes about Mr. White's performance. *Id.* at 5–6 (Perrier Decl. ¶¶ 23–26). Mr. Hughes informed Mr. Perrier that he had prepared a write-up for the December 13, 2015, issue. *Id.* at 6 (Perrier Decl. ¶ 26). On December 17, 2015, Mr. White received the write-ups prepared by Mr. Perrier and Mr. Hughes, resulting in Mr. White's termination for three Rule 9 write-ups. *Id.* at 7 (Perrier Decl. ¶¶ 28–30); Doc. 43-2 at 2. Mr. White packed up his locker and left the plant. Doc. 43-11 at 20 (White Dep. 69:1–5, 72:11–21). While packing up his locker, Mr. White placed several "check sheets," which contained information about plant production, in his backpack.[5] *Id.* at 21 (White Dep. 73:4–12); *see* Doc. 39-1 (check sheets containing information about the production line).

---

[5] Mr. White indicated that a former supervisor, Tim Miller, had advised him in 2008 or 2009 to maintain a copy of his check sheets in case plant managers questioned his work. Doc. 43-11 at 21–22 (White Dep. 76:18–77:18). Mr. White, however, admitted no one gave him permission to remove the check sheets from CertainTeed property. *Id.* at 37 (White Dep. 138:21–25). And Mr. White, when asked about company policy on removing documents, said: "I know you can't take company – off company property, but at the same time, I was only keeping them because I got checked by Tim Miller a long time ago because – and so I got checked by Tim Miller." Doc. 38-7 at 7 (White Dep. 75:7–11).

The Union filed a grievance over Mr. White's termination. Doc. 43-42 at 2. Doug Billings, who assumed the position as CertainTeed's Kansas City plant's Human Resources Manager in December 2015, investigated Mr. White's termination. Doc. 38-9 at 2–3 (Billings Decl. ¶¶ 3, 9). Mr. Billings determined CertainTeed failed to follow the progressive discipline policy when terminating Mr. White because Mr. White received the second and third Rule 9 write-ups at the same time. *Id.* at 4 (Billings Decl. ¶¶ 12–13). Mr. Billings recommended CertainTeed reinstate Mr. White, and Mr. Perrier and Mr. Weigert accepted this recommendation. *Id.* (Billings Decl. ¶¶ 13, 16).

On January 13, 2016, Mr. White met with Mr. Billings, Mr. Perrier, and Mr. Weigert. *Id.* (Billings Decl. ¶ 18). Mr. Billings advised Mr. White that CertainTeed was prepared to reinstate him. *Id.* at 4 (Billings Decl. ¶ 19). Mr. Perrier and Mr. Weigert then began to discuss Mr. White's performance issues. Doc. 43-11 at 34 (White Dep. 126:3–6, 126:10–14). Mr. Perrier produced a graph of the washwater system settings and accused Mr. White of misadjusting the settings to reduce the amount of fiber scraps the system collected and, in turn, the amount of fiber scraps he needed to clean. *Id.* (White Dep. 126:3–6, 126:10–14). Mr. White pulled out several check sheets he had removed from his locker when terminated and contended he was not on duty when the washwater system settings were adjusted. *Id.* (White Dep. 126:18–127:15). Mr. Billings and Mr. Perrier accused Mr. White of stealing company property by removing the check sheets. *Id.* (White Dep. 127:16–129:3). Mr. Billings rescinded the reinstatement offer because removing "confidential and proprietary company records from the plant premises" was against "long-standing plant protocol." Doc. 38-9 at 5 (Billings Decl. ¶¶ 23, 28). CertainTeed formally terminated Mr. White on January 14, 2016, listing the reason for termination as "For Cause – Theft of Company Documents." Doc. 43-23 at 2.

The Union arbitrated Mr. White's termination. Doc. 43-31 at 2. On May 31, 2016, with the Union's petition for arbitration still pending, Mr. White filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Kansas Human Rights Commission. Doc. 38-27 at 2. Mr. White's EEOC charge identifies race, disability, retaliation, and national origin as the forms of discrimination he experienced. *Id.* On July 19, 2016, the EEOC notified CertainTeed that Mr. White filed a charge of discrimination. Doc. 43-44.

On August 25, 2016, an arbitrator conducted a hearing on the Union's grievance of Mr. White's January 2016 termination. Doc. 33 at 4 (Pretrial Order at ¶ 2.a.16). On October 26, 2016, the arbitrator issued a decision in Mr. White's favor. *Id.* (Pretrial Order at ¶ 2.a.17); Doc. 43-46 at 2. The arbitrator's decision provided CertainTeed 15 days from receiving the decision to reinstate Mr. White and pay him back wages. Doc. 43-3 at 15. On November 14, 2016, CertainTeed contacted the Union about calculating Mr. White's back wages. Doc. 38-24. On November 17, 2016, CertainTeed reinstated Mr. White as a Utility Cullet on the K-21 line. Doc. 43-36 at 2. Discussion between CertainTeed and the Union about the amount of back wages owed to Mr. White, however, continued through mid-December. *See* Doc. 38-25 (Dec. 13, 2016, e-mail from CertainTeed to the Union about updated calculation of back wages). On December 21, 2016, more than 15 days after receiving the arbitrator's decision, CertainTeed paid Mr. White $49,312.33 in back wages. Doc. 33 at 4 (Pretrial Order at ¶ 2.a.19). Mr. White remained employed by CertainTeed when he commenced this action. Doc. 38-5 at 3 (Hughes Decl. ¶ 8).

**B.     Mr. White's Allegations of Discrimination & Hostile Work Environment**

Mr. White's Complaint asserts claims for discrimination based on race, national origin, and disability. The court derives the following from the exhibits submitted with the parties' summary judgment filings.

On his race discrimination claim, Mr. White admitted he was not subject to and did not personally hear any derogatory remarks or racial slurs. Doc. 38-7 at 11, 35 (White Dep. 160:17–161:9, 461:19–462:4). Mr. White, however, testified that he considered it racially discriminatory when plant managers (1) spoke to him in a "very blunt" manner; (2) wanted him to "be quiet and just do [his] job [without] talking back"; and (3) told him what to do without permitting him to have input on operational decisions. *Id.* at 13 (White Dep. 167:1–168:1). Also, Mr. White testified that he perceived discrimination in the plant based on how employees congregated around the timeclock, with only white employees congregating there. *Id.* at 20 (White Dep. 225:8–17). Mr. White also testified that African-American employees were written up more frequently when their supervisors were away from the plant. *Id.* at 21 (White Dep. 231:11–232:21). But Mr. White acknowledged he did not know whether Caucasian employees were also written up more frequently when their supervisors were away. *Id.* (White Dep. 232:22–24). Finally, Mr. White testified about several incidents at CertainTeed that he believed contributed to a racially hostile work environment. *See, e.g.*, Doc. 43-11 at 30–31 (White Dep. 112:4–113:8). Mr. White conceded, however, that he learned about all these incidents secondhand. *See, e.g.*, *id.* And, of the incidents he discussed, only one incident appears in other evidence properly before the court—that being an incident where Mr. Perrier allegedly poked an African-American employee while calling the employee "boy." *See* Doc. 43-19 at 9, 11 (Perrier Dep. 29:21–32:6, 38:19–23).

Turning to national origin, Mr. White testified that he heard from another employee that a manager called a different employee a "dumb" and "lazy" American. Doc. 38-7 at 18–19 (White Dep. 188:14–189:13).[6] Mr. White also believed that Mr. Perrier and Mr. Weigert held a negative

---

[6] Typically, the court would not consider this testimony because Mr. White lacked personal knowledge of the manager's statements. *See* Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602. Mr. Billings, however, testified that he

opinion of Americans because, when he approached them, they often began to speak in a foreign language, which Mr. White interpreted as their way of secretly saying negative things about Americans.  Doc. 43-11 at 49 (White Dep. 185:1–188:8).  Mr. White acknowledged, however, that he does not speak any foreign languages, was never the subject of any negative comments about Americans, and did not personally hear any such comments.  *Id.* at 44 (White Dep. 165:13–16).

Finally, on his disability discrimination claim, Mr. White believes CertainTeed managers harassed him when (1) they asked him repeatedly why he was wearing a respirator mask and (2) Mr. Shelly, Mr. Weigert, and Mr. Perrier would not permit him to wear a mask until he produced a more specific doctor's note and received training about how to wear the mask.  *Id.* at 72 (White Dep. 277:12–278:10).  In this vein, Mr. White testified that Mr. Shelly "stayed on [him]" about wearing a mask.  *Id.* at 64–65 (White Dep. 248:24–249:3).  But, Mr. White did not provide any details about his interactions with Mr. Shelly about the mask outside of mid-February 2015.  And, as with his race and national origin discrimination claims, Mr. White admitted he neither was the target of nor heard any insulting or derogatory remarks based on disability.  *Id.* at 43 (White Dep. 164:10–23).

In 2015, Mr. White discussed his perception of these episodes of discrimination with fellow hourly employees.  *Id*. at 38 (White Dep. 143:2–8).  But, Mr. White admitted that he did not complain to "any manager or HR employee."  *Id.* (White Dep. 143:9–14).  This is so because Mr. White was "nervous" about what management might do if he complained to a manager or HR employee and because he felt no one at CertainTeed would act on his complaint.  *Id.* at 39, 41 (White Dep. 148:11–23, 154:18–25).

---

received a report that a manager had called an employee stupid and counseled that manager not to label Americans "stupid."  Doc. 43-6 at 17 (Billings Dep. 64:15–17).

### C. Mr. White's Claims and the Procedural History of the Litigation

Mr. White filed a five-count Complaint. Doc. 1. Count I of the Complaint raises claims under the ADA alleging discrimination, failure to accommodate, and harassment/hostile work environment. *Id.* at 10–11 (Compl. at ¶¶ 81–88). Count II asserts a claim for retaliation under the ADA. *Id.* at 11–12 (Compl. at ¶¶ 89–95). Count III claims race discrimination and harassment/hostile work environment under Title VII and 42 U.S.C. § 1981. *Id.* at 12–14 (Compl at ¶¶ 96–102). Count IV presents a claim for national origin discrimination under Title VII. *Id.* at 14–15 (Compl. at ¶¶ 103–08). Finally, in Count V, Mr. White makes claims for retaliation under Title VII and 42 U.S.C. § 1981, alleging CertainTeed retaliated against him after he had opposed race and national origin discrimination. *Id.* at 15–16 (Compl. at 109–16).

The court ordered the parties to submit Federal Rule of Civil Procedure 26(a) initial disclosures by October 5, 2017. Doc. 2 at 2 (Initial Order Regarding Planning and Scheduling). Both parties timely filed their initial disclosures. *See* Docs. 8, 9 (certificates of service for Rule 26(a) disclosures). Mr. White's initial disclosure identified five potential witnesses by name— Mr. White, Summor White, Mr. Perrier, Mr. Weigert, and Mr. Billings. It also noted an intent to designate additional witnesses, specifically "individuals necessary for rebuttal" and "individuals identified by defendants." Doc. 35-1 at 2–3.

In an October 2017 Scheduling Order, the court set a September 14, 2018, deadline for the parties to complete all discovery and an October 15, 2018, deadline for summary judgment motions. Doc. 10 at 13 (Scheduling Order). The court also required the parties to serve any supplemental Rule 26 disclosures at least 40 days before the September 14, 2018, discovery deadline. *Id.* at 3 (Scheduling Order at ¶ 2.a). The Scheduling Order advised: "Should anything be included in the final disclosures under Fed. R. Civ. P. 26(a)(3) that has not previously

appeared in the initial Rule 26(a)(1) disclosures or a timely Rule 26(e) supplement thereto, the witness or exhibit probably will be excluded from offering any testimony under Fed. R. Civ. P. 37(c)(1)." *Id.* (Scheduling Order a ¶ 2.a).

On September 11, 2018, after the deadline imposed by the court and just three days before the discovery cutoff, Mr. White served CertainTeed with a supplemental disclosure. Doc. 35-2 at 8. The supplemental disclosure named Gregg Stallings, Loretta Blackwell, Henry Jones, Todd Cannon, Jr., James Wooten, Jeff Patterson, Roger Maxwell, Sr., and Roger Maxwell, II, as potential witnesses. *Id.* at 4–6. On September 14, 2018, one day before the discovery deadline, Mr. White served CertainTeed with Mr. Stallings's affidavit. *See* Doc. 30. And, after the deadline for discovery, Mr. White served CertainTeed with the affidavits signed by Mr. Jones and Mr. Patterson. *See* Docs. 31, 32.

The court conducted a pretrial conference on October 1, 2018, during which CertainTeed advised the court that it intended to file motions to strike evidence from witnesses disclosed for the first time in Mr. White's supplemental disclosure, including the affidavits of Mr. Stallings, Mr. Jones, and Mr. Patterson. Doc. 33 at 22–23 (Pretrial Order at ¶¶ 8.b.ii-iii). The court gave CertainTeed until October 5, 2018, to file its motion to strike. *Id.* at 23 (Pretrial Order at ¶ 8.b.iii). CertainTeed complied with that deadline, moving to strike the supplemental disclosures. Doc. 34 (Motion to Strike Plaintiff's Untimely Amended Rule 26 Disclosures). It also filed a timely motion for summary judgment against all of Mr. White's claims. Doc. 37 (Motion for Summary Judgment). Responding to the Motion for Summary Judgment, Mr. White submitted affidavits from Mr. Stallings, Mr. Jones, and Mr. Patterson. Doc. 43-13, Doc. 43-16, Doc. 43-17. Mr. White also submitted transcripts of two audio recordings of meetings between Mr. White and Mr. Monroe. Doc. 43-22, Doc. 43-23. CertainTeed moved to strike Documents

43-13, 43-16, 43-17, 43-22, and 43-23.  Doc. 44.  The parties have completed briefing on all three pending motions.  The court addresses CertainTeed's Motion to Strike Plaintiff's Opposition Exhibits 13, 16, 17, 22, and 23 before turning to CertainTeed's Motion for Summary Judgment.

## II.     Analysis

### A.     Motion to Strike Plaintiff's Opposition Exhibits 13, 16, 17, 22, and 23

#### 1.     Exhibits 13, 16, and 17

CertainTeed asks the court to strike the affidavits by Mr. Stallings, Mr. Jones, and Mr. Patterson because (1) Mr. White failed to identify these individuals in his timely Rule 26 disclosures and (2) the affidavits do not comply with Federal Rule of Civil Procedure 56(c). Doc. 45 at 2–9.  Finding CertainTeed's first argument persuasive, the court declines to consider these three affidavits as part of its summary judgment analysis.

Rule 26(a) requires a party to provide initial disclosures identifying "the name . . . of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A)(i).  After making an initial Rule 26 disclosure, a party has a continuing duty to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete."  Fed. R. Civ. P. 26(e)(1)(A).  Mr. White's Rule 26(a) initial disclosure did not identify Mr. Stallings, Mr. Jones, or Mr. Patterson as "individuals likely to have discoverable information."  And, while Mr. White identified these individuals in his supplemental disclosure, he did not serve his supplemental disclosure on CertainTeed until more than a month had passed after the court-imposed deadline for supplemental disclosures.

Mr. White thus did not timely identify Mr. Stallings, Mr. Jones, and Mr. Patterson as witnesses as required by Rule 26 and the court's Scheduling Order.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c). When deciding whether a failure to disclose is justified or harmless, a court should consider: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co*, 170 F.3d 985, 993 (10th Cir. 1999)). "The party who failed to make the required disclosure has the burden to demonstrate substantial justification or the lack of harm." *Estate of McDermed v. Ford Motor Co.*, No. 14-cv-2430-CM-TJJ, 2016 WL 1298096, at *3 (D. Kan. Apr. 1, 2016).

Mr. White's failure to disclose is not justified. The record establishes that Mr. White, in the course of his ongoing employment at CertainTeed, knew the identities of his fellow employees—Mr. Stallings, Mr. Jones, and Mr. Patterson—well before the August 2018 deadline for supplemental disclosures. And, Mr. White, as evidenced by his June 2018 deposition testimony, knew that these individuals might have information beneficial to his case. *See* Doc. 43-11 at 31 (White Dep. 115:22–116:15) (Mr. White providing secondhand details about incident involving Mr. Stallings); *id.* at 41 (White Dep. 155:6–156:3) (Mr. White providing secondhand details about incident involving Mr. Jones). But, Mr. White waited until mid-August 2018 to contact the witnesses. Doc. 47 at 2 (Plaintiff's Response in Opposition to Defendant's Motion to Strike Plaintiff's Opposition Exhibits Nos. 13, 16–17 and 22–23 at ¶ 4).

Nothing prevented Mr. White from identifying Mr. Stallings, Mr. Jones, and Mr. Patterson in a timely Rule 26(e) supplemental disclosure.[7]

Instead of timely disclosing these witnesses, Mr. White waited to provide CertainTeed these names until a few days before the close of discovery, at a time when it was impossible for CertainTeed to schedule depositions before the discovery deadline. And allowing Mr. White to rely on affidavits from witnesses CertainTeed could not depose before the deadlines for discovery and dispositive motions would prejudice CertainTeed. Also, while Mr. White contends CertainTeed should not be surprised by the late disclosure of Mr. Stallings, Mr. Jones, and Mr. Patterson because Mr. White mentioned them in his deposition testimony, it is not CertainTeed's responsibility to select and marshal the evidence which Mr. White will rely to meet his evidentiary burdens. Finally, Mr. White suggests calling a do-over on the discovery deadline to allow CertainTeed an opportunity to depose the additional witnesses and then supplement its pending motion for summary judgment. Doing so, however, would delay the trial and impose unwarranted litigation expenses on CertainTeed. While some circumstances might warrant this approach, this one doesn't because Mr. White hasn't substantially justified his untimely conduct.

---

[7] Mr. White argues he experienced difficulty convincing the witnesses to come forward because the witnesses felt intimidated and feared retaliation if they made claims of discrimination against CertainTeed. Doc. 36 at 2, 4 (Plaintiff's Response in Opposition to Defendant CertainTeed's Motion to Strike Plaintiff's Amended Rule 26 Disclosures at ¶¶ 2, 10); Doc. 47 at 2 ("Plaintiff's Response in Opposition to Defendant's Motion to Strike Plaintiff's Opposition Exhibit Nos. 13, 16–17, and 22–23" at ¶ 4); *see also* Doc. 36 at 7–8; Doc. 47 at 5. But, Mr. White fails to support this argument with any citations to the record. And none of the affidavits from Mr. Stallings, Mr. Jones, and Mr. Patterson attest to facts supporting this contention. *See* Doc. 35-3 (Stallings Aff.), Doc. 35-4 (Jones Aff.), Doc. 35-5 (Patterson Aff.). In fact, where Mr. Stallings attests that he filed an EEOC charge alleging discrimination and that CertainTeed reinstated his qualifications thereafter, Doc. 35-3 at 4 (Stallings Aff. at ¶¶ 22–23), one reasonably can infer he was not reluctant to advance a charge of discrimination and did not suffer retaliation when he previously advanced a charge of discrimination. In any event, Mr. White does nothing to explain why he waited until mid-August 2018 to contact Mr. Stallings, Mr. Jones, and Mr. Patterson.

Considering all these matters together, it is evident that Mr. White did not timely identify Mr. Stallings, Mr. Jones, and Mr. Patterson as witnesses or timely provide CertainTeed with Mr. Jones and Mr. Patterson's affidavits. Mr. White also fails to carry his burden and demonstrate that his late disclosure was justified or harmless. Relying on the sanction provided by Rule 37(c)(1) and the warning in the Scheduling Order, the court declines to consider Documents 43-13, 43-16, and 43-17 when adjudicating CertainTeed's Motion for Summary Judgment.

### 2. Exhibits 22 and 23

Mr. White secretly recorded two meetings he had with Mr. Monroe. Documents 43-22 and 43-23 are transcripts of those audio recordings. CertainTeed moves to strike Documents 43-22 and 43-23 on the ground that the transcripts are not accompanied by an authenticating affidavit and that they contain inadmissible hearsay. Doc. 45 at 10. Mr. White contends he can authenticate the recordings at trial and that, under Federal Rule of Evidence 801(d), Mr. Monroe's statements are not hearsay. Doc. 47 at 14–15.

"To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)). While this does not require that the evidence submitted at summary judgment be "in a form that would be admissible at trial," it does require that "the content or substance of the evidence [submitted at summary judgment] must be admissible." *Id.* (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)). And, where the evidence offered at summary judgment is not admissible in its submitted form, it is incumbent on the

proponent of the evidence to demonstrate how the proponent will present the evidence so that it is admissible at trial. *Id.*

For audio recordings, there is no hard and fast rule requiring an affidavit to authenticate every piece of evidence submitted for consideration at summary judgment. *Armijo v. Santa Fe Cty.*, No. 17-cv-00574-WJ-SCY, 2018 WL 3118290, at *6 (D.N.M. June 25, 2018) (citing *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009)). Instead, a court may rely on Federal Rule of Evidence 901(b)'s considerations for authentication, such as the recording's "contents," "substance," and "other distinctive characteristics." *Id.* (quoting Fed. R. Evid. 901(b)(4)).

Mr. White did not submit an authenticating affidavit with the transcript of the recording of his November 2015 meeting with Mr. Monroe—the meeting where Mr. Monroe issued him a write-up. But, both Mr. White and Mr. Monroe provided deposition testimony that the meeting had occurred and testified about the substance of the meeting. And, at a trial, Mr. White, as the individual who recorded the meeting, could authentic the audio recording. Mr. White thus has satisfied his burden on the Rule 901 considerations.

This conclusion leads to the question whether Mr. White can reduce the statements made during the meeting to admissible evidence. Under the Federal Rules of Evidence, an out-of-court statement offered to prove the truth of the matter typically qualifies as inadmissible hearsay. Fed. R. Evid. 801(c), 802. Out-of-court statements by an opposing party, however, are not hearsay if they were "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). Under this Rule of Evidence, Mr. Monroe's statements when he issued Mr. White the Rule 9 write-up at the direction of Mr. Perrier are not hearsay. But if offered by Mr. White, his statements and those by a third

individual on the recording—the Union representative—could not be admitted under Fed. R. Evid. 801(d)(2)(D) because neither Mr. White nor the Union representative are opposing parties. Thus, as offered by Mr. White, the court may consider Mr. Monroe's statements for the truth of the matter asserted under Rule 801(d)(2)(D). Likewise, if offered by CertainTeed, the court may consider Mr. White's statements under Rule 801(d)(2)(A). But in contrast, if Mr. White is the proponent of the offer, the court may consider Mr. White's and the Union representative's statements only for context of Mr. Monroe's statements.

Turning to the transcript in Document 43-23, it is not apparent when this exchange between Mr. Monroe and Mr. White occurred. And, unlike the conversation in Document 43-22, the Document 43-23 conversation was not the subject of extensive deposition testimony. Also, portions of Mr. Monroe's statements are marked as "inaudible." Doc. 43-22 at 2. In sum, Mr. White has failed to authenticate the transcript in Document 43-22, so he has not met his burden under the governing legal standard.[8]

### B.     Motion for Summary Judgment

#### 1.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute [about] any material fact" exists and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). A disputed "issue of fact is 'genuine' 'if the evidence is such

---

[8]     In any event, Mr. White offers this recording trying to establish that CertainTeed managers knew he possessed check sheets during his term of employment. Doc. 47 at 15. Mr. White's possession of check sheets inside the CertainTeed plant, while employed by CertainTeed, is not material to the issue whether Mr. White violated plant rules by removing the check sheets from plant property when CertainTeed initially terminated him in December 2015.

that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And an "issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. Cmty. Care HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party meets its initial burden, the non-moving party "'may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)). To survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

### 2.    Basic *McDonnell Douglas* Framework

A plaintiff advancing a claim of discrimination or retaliation may prove his claim with direct or indirect (circumstantial) evidence.  *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 (10th Cir. 2011).  Where the plaintiff relies on circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies.  *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).  Under this framework, the plaintiff has an initial burden to make out a prima facie case.  *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003).  In its most basic form, a prima facie case requires the plaintiff to establish:  (1) he "is a member of a protected class"; (2) he "suffered an adverse employment action"; and (3) "the challenged action occurred under circumstances giving rise to an inference of discrimination."  *Bennett v. Windstream Commc'ns., Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015).  As outlined below, depending on the nature of the discrimination alleged and the adverse employment action supporting the claim, hybrids of this basic statement of the *McDonnell Douglas* framework apply.  If the plaintiff sustains his initial burden, "the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the challenged action."  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001).  If the defendant advances a legitimate nondiscriminatory reason, then the burden shifts back to the plaintiff to prove the reason "is merely a pretext for unlawful discrimination."  *Id*.

### 3.    Count I – Discrimination Under the ADA

An employer subject to the ADA must not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The concluding phrase "terms, conditions,

and privileges of employment" precludes an employer from creating a work environment hostile toward employees covered by the ADA. *Lanman v. Johnson Cty., Kan.*, 393 F.3d 1151, 1155–56 (10th Cir. 2004). And, the ADA further defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

Count I of Mr. White's Complaint advances three theories in support of his claim for disability discrimination: (1) CertainTeed failed to provide him a reasonable accommodation by not permitting him to wear a respirator mask; (2) CertainTeed terminated his employment because of his disability; and (3) CertainTeed harassed him for wearing a respirator mask, creating a work environment hostile toward individuals with disabilities. Doc. 1 at 10–11 (Compl. at ¶¶ 81–88). The court concludes none of these three theories of discrimination can survive summary judgment.

### a. Failure to Accommodate

CertainTeed contends Mr. White failed to exhaust his administrative remedies in a timely manner for any failure to accommodate that may have occurred.[9] Doc. 38 at 27–33. "Title I of the ADA requires a plaintiff to exhaust [his] administrative remedies before filing suit." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007). A plaintiff normally may not bring an ADA claim "based upon claims that were not part of a timely-filed EEOC charge for which the

---

[9] CertainTeed also argues: (1) its denial of Mr. White's accommodation request did not result in an adverse employment action; (2) Mr. White failed to engage in the interactive process by not providing an adequate doctor note; and (3) Mr. White's request for a full-face respirator mask was not a reasonable accommodation where he could perform his job without wearing a mask. Doc. 38 at 43–49. Because CertainTeed's failure-to-exhaust argument is dispositive, the court finds it unnecessary to address CertainTeed's additional arguments for summary judgment.

plaintiff has received a right-to-sue letter." *See Foster v. Ruhrpumpen*, 365 F.3d 1191, 1194

(10th Cir. 2004) (stating such in context of Title VII claim); *see also* 42 U.S.C. § 12117(a)

(incorporating administrative remedy provision of Title VII into ADA). To file an EEOC charge

in a timely manner, an employee must file the charge within 180 days of the alleged unlawful

employment action unless the employee also institutes proceedings with a state or local agency,

in which case the employee has 300 days to file his charge. 42 U.S.C. § 2000e-5(e)(1). And,

"each discrete incident of [discrimination] constitutes its own 'unlawful employment practice'

for which administrative remedies must be exhausted." *Martinez v. Potter*, 347 F.3d 1208, 1210

(10th Cir. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–13 (2002)).

Thus, an EEOC charge is timely for any given discrete incident of discrimination only if filed

within 300 days of the incident. *Morgan*, 536 U.S. at 110.

Mr. White filed his EEOC charge on May 31, 2016. Doc. 38-27 at 2. The EEOC charge

thus was timely and effective for any discrete incidents occurring on or after August 5, 2015.[10]

Mr. White, however, requested to wear a respirator mask in February 2015. And, Mr. White

admitted during his deposition that, by the end of May 2015, CertainTeed had denied his request

and he ceased wearing a mask or inquiring about wearing a mask. Doc. 43-11 at 68 (White Dep.

261:5–262:7); Doc. 38-7 at 31 (White Dep. 323:11–324:12). As such, Mr. White filed his EEOC

charge at least two months too late to timely exhaust his administrative remedies for

CertainTeed's refusal to let him wear a respirator mask. The court therefore concludes that any

claim of discrimination based on a failure to accommodate fails.

---

[10]    Mr. White benefits from the 300-day period in 42 U.S.C. § 2000e-5(e)(1) because he simultaneously filed
his charge with the Kansas Human Rights Commission. *See* Doc. 38-27 at 2.

### b.     Termination

When a plaintiff asserts a claim of discrimination under the ADA based on his termination, he can establish a prima facie case of discrimination through circumstantial evidence by showing: "(1) he is disabled within the meaning of the ADA; (2) he can perform, either with or without reasonable accommodation, the essential function of the desired job; and (3) 'that [the defendant] terminated him because of his disability.'"[11]  *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912 n.4 (10th Cir. 2004) (quoting *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995)).  For purposes of summary judgment, CertainTeed concedes Mr. White can satisfy the first two elements of his prima facie case, but argues he cannot satisfy the third element.  Doc. 38 at 37–38.  To satisfy the third element, a plaintiff must "present some affirmative evidence that disability *was a determining factor* in the employer's decision." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (emphasis added).  "This burden is 'not onerous' but it is also 'not empty or perfunctory.'"  *Id*. at 1323–24 (citation omitted) (quoting *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995)).

Mr. White tries to satisfy his burden by relying on *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736 (10th Cir. 1999), and the alleged fact that he only received Rule 9 write-ups after his request for an accommodation.  Doc. 43 at 86–87.  As an initial matter, Mr. White's argument isn't factually accurate—at least not completely—because the November 2015 Rule 9 write-up issued by Mr. Monroe was not Mr. White's first Rule 9 violation.  Instead, a review of Mr. White's own deposition testimony reveals Mr. White received a Rule 9 written warning on

---

[11]     Alternatively, a plaintiff may offer "direct evidence" of discrimination.  *Jones*, 502 F.3d at 1188 n.6.  To establish discrimination with direct evidence, a plaintiff "must prove 'the existence of a fact in issue without inference or presumption'" by identifying evidence such as a discriminatory policy adopted by the employer.  *Id.* (quoting *Hall v. Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007)).  Mr. White does not contend that his ADA discrimination claim may survive summary judgment based on direct evidence.

December 31, 2014, two months before he requested any accommodation.  Doc. 43-11 at 11–12 (White Dep. 36:7–37:5).  But, even if Mr. White had not received a Rule 9 written warning shortly before requesting an accommodation, his argument would fail as a matter of law.

Relying on *Butler*, Mr. White essentially argues that his request for accommodation and his Rule 9 write-ups and termination occurred within a sufficiently close time period to allow a jury to infer that his accommodation request and his breathing condition motivated CertainTeed's actions.  The Tenth Circuit has "repeatedly recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to justify an inference of [discriminatory] motive."  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (internal quotation marks omitted).  A plaintiff may rely on temporal proximity alone, however, when the request for accommodation and the adverse employment action are "*very closely* connected in time."  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original).  While no bright line defines how close in time the events must occur for a plaintiff to rely on temporal proximity alone, the Tenth Circuit has held that a one-and-a-half-month gap was sufficient while a three-month gap was too long.  *Metzler*, 464 F.3d at 1172 (citing *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)).

Mr. White requested an accommodation in February 2015 and, by May 2015, he stopped wearing a respirator mask.  But, Mr. White did not receive his first post-accommodation request Rule 9 write-up for another six months—in November 2015.  And, CertainTeed did not attempt to terminate his employment until December 2015.  This multi-month gap between Mr. White's actions based on his disability and the disciplinary action imposed by CertainTeed is too expansive for Mr. White to rely on temporal proximity alone.  *Cf. Butler*, 172 F.3d at 749–50

(holding that timing of events, when considered alongside evidence of disparate treatment both with respect to termination and handling of plaintiff's internal complaint of discrimination, allowed for inference of discrimination). Yet, Mr. White does not direct the court to any other evidence supporting an inference of discrimination. Thus, as a matter of law, Mr. White has not sustained his burden on the third element of his prima facie case.

### c.      Hostile Work Environment

In a final attempt to make out a prima facie claim of ADA discrimination, Mr. White argues that the panoply of events he experienced after he requested an accommodation for his breathing condition created a hostile work environment. *See* Doc. 43 at 79–80 (listing events Mr. White believes amount to harassment based on disability). To advance an ADA discrimination claim based on a hostile work environment, a plaintiff must show more than "general harassment." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 897 (10th Cir. 2017). The elements of a claim for hostile work environment under the ADA are:

> (1) the plaintiff is a member of a protected group (i.e., he is "disabled" as defined by the ADA); (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on the alleged disability; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment).

*Callahan v. Commc'n Graphics, Inc.*, 657 F. App'x 739, 746–47 (10th Cir. 2016) (citing *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007)). Central to the prima facie case of a hostile work environment claim, the plaintiff "must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams*, 849 F.3d at 897 (quoting *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998)). "In examining whether a plaintiff has

made the requisite showing, '[the court looks] to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Morgan*, 536 U.S. at 116). The court must "consider the work atmosphere 'both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position.'" *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (quoting *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 923 (10th Cir. 2001)). "[A] few isolated incidents" of remarks expressing hostility toward individuals with disabilities will not suffice; "[i]nstead, there must be a steady barrage of opprobrious [disability-based] comments." *Id.* (quoting *Chavez v. New Mexico*, 397 F.3d 826, 831 (10th Cir. 2005)).

CertainTeed argues Mr. White has not advanced evidence showing that he was subject to harassment based on disability, no less severe and pervasive harassment that affected the terms of his employment. Doc. 39 at 36–37. In response, Mr. White directs the court to the inquiries and verbal reprimands he received from Mr. Shelly, Mr. Perrier, and Mr. Wiegert about his donning of a respirator mask in February 2015. *Id.* at 79. The court doubts whether these inquiries could amount to harassment on the basis of disability. But, even assuming a reasonable jury could view these inquiries as harassing, the court has no difficulty concluding that any harassment was not so severe or pervasive that it could have affected Mr. White's terms of employment. The inquiries at issue lasted but a few weeks, were calibrated to acquire information from Mr. White about his respiratory condition, and were not accompanied by any derogatory or insulting remarks. In fact, Mr. White concedes he never heard any manager at CertainTeed make a derogatory or insulting disability-based remark. Doc. 43-11 at 43 (White

Dep. 164:10–23). And, where Mr. White admits he did not need to wear a mask to perform any of his job functions, *id.* at 69 (White Dep. 265:18–22), it is not apparent (1) how the inquiries by CertainTeed managers affected the terms of Mr. White's employment or (2) that a reasonable employee in Mr. White's position would have found his workplace hostile. Mr. White has not satisfied his burden of making a prima facie case of a hostile work environment, and the court thus grants CertainTeed's Motion for Summary Judgment against Count I.[12]

### 4.    Count II – ADA Retaliation

In Count II, Mr. White alleges the actions that he advanced in support of his ADA discrimination claim also support a claim that CertainTeed retaliated against him for requesting a reasonable accommodation. Doc. 1 at 11–12 (Compl. at ¶¶ 89–95). Under the ADA, "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). Where a plaintiff relies on circumstantial evidence to advance his ADA retaliation claim, the familiar analytical framework from *McDonnell Douglas* applies. *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016). To establish a prima facie case for retaliation, "the plaintiff must prove that (1) he 'engaged in a protected activity'; (2) he was 'subjected to an adverse employment action subsequent to or contemporaneous with the protected activity'; and (3) there was 'a casual connection between the protected activity and the adverse employment action.'" *Id.* (brackets omitted) (quoting *Anderson*, 181 F.3d at 1178).

---

[12]    Mr. White tries to bootstrap the write-ups he received and his termination to his hostile work environment claim. But, the court's earlier conclusion that no evidence will support an inference that those events were related to Mr. White's disability disposes of Mr. White's argument.

CertainTeed contends Mr. White fails to satisfy the third element because (1) the individuals who issued his write-ups and who terminated his employment did not know about his breathing condition; and (2) Mr. White cannot rely on temporal proximity alone to establish causation where more than six months had elapsed between Mr. White's last attempt to wear a mask and his termination. Doc. 38 at 49–51.

Mr. White experienced three potential adverse employment actions after requesting an accommodation: (1) the November 2015 write-up by Mr. Monroe; (2) the December 2015 write-ups and termination at the direction of Mr. Perrier and Mr. Hughes; and (3) the January 2016 termination at the direction of Mr. Billings, Mr. Perrier, and Mr. Weigert. CertainTeed correctly points out that to establish causation between the protected activity and adverse employment action, the plaintiff must demonstrate that the decisionmaker was aware of the protected activity. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1213 (10th Cir. 2018) (reaching same conclusion within context of retaliation claim under the Federal Railroad Safety Act). But a reasonable jury could conclude that Mr. Monroe and Mr. Weigert both knew of Mr. White's accommodation request. Specifically, in February 2015, Mr. Shelly sent Mr. Monroe an e-mail discussing Mr. White's breathing condition and request to wear a respirator mask. Doc. 38-10 at 44. And, he copied Mr. Weigert on the e-mail. *Id.* Having rejected CertainTeed's first argument, the court turns to its second argument.

Like with his ADA discrimination claim, Mr. White tries to establish causation by relying on the write-ups and his termination occurring only after his request for an accommodation. But, as with his ADA discrimination claim, the write-ups Mr. White received and his termination occurred at least five months after Mr. White last had tried to wear a respirator mask. And, more

than eight months had passed since he had requested an accommodation.  Thus, Mr. White cannot rely on temporal proximity alone.

Because he offers no other evidence to support his ADA retaliation claim, this conclusion ends the analysis.  CertainTeed is entitled to summary judgment on the retaliation claim asserted by Count II.[13]

### 5.    Count III – Race Discrimination Under Title VII and § 1981

In Count III, Mr. White makes claims for race discrimination under Title VII and 42 U.S.C. § 1981.  Doc. 1 at 12–14 (Compl. at ¶¶ 96–102).  It is unlawful under Title VII for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms of conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a).  Section 1981 of Title 42, meanwhile, provides a cause of action when an employee can establish that his employer engaged in "intentional discrimination" on the basis of race.  *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir. 1994).  Where a plaintiff relies on circumstantial evidence to advance a claim of discrimination under either Title VII or § 1981, his claim is subject to the *McDonnell Douglas* burden-shifting framework.  *See id.* (applying framework to § 1981 claim); *Fischer v. Forestwood Co.*, 525 F.3d 972, 978 (10th Cir. 2008) (applying framework in Title VII setting).

---

[13]    Mr. White also suggests CertainTeed retaliated against him after he filed his EEOC charge by advancing accusations against him at the August 2016 arbitration hearing.  But CertainTeed argues Mr. White failed to exhaust his administrative remedies for any post-EEOC Charge retaliation, and Mr. White did not meaningfully respond to that argument.  Likewise, Mr. White failed to identify any case law suggesting that the administrative exhaustion requirement does not apply to a retaliation claim.  By failing to respond substantively to CertainTeed's argument, Mr. White has abandoned his ADA retaliation claim to the extent it relied on actions that post-date his EEOC charge.  *See Zane v. Kramer*, 195 F. Supp. 3d 1243, 1256 (W.D. Okla. 2016) (plaintiff waived claim where he did not respond to dispositive argument raised in defendants' motion for summary judgment); *Palmer v. Unified Gov't of Wyandotte Cty./Kan. City, Kan.*, 72 F. Supp. 2d 1237, 1250–51 (D. Kan. 1999) ("[T]he court deems plaintiff's failure to respond to an argument raised in defendants' papers tantamount to an express abandonment of any such claim."); *see also Klaassen v. Atkinson*, 348 F. Supp. 3d 1106, 1180 n.10 (D. Kan. 2018) (concluding plaintiff abandoned claim where he did not respond to defendant's argument).

Responding to the summary judgment motion, Mr. White argues his race discrimination claim is based on CertainTeed (1) issuing him Rule 9 write-ups and terminating his employment, and (2) creating a hostile work environment for African-Americans. Doc. 43 at 81–84. The court addresses each basis in turn.

To establish a prima facie case of discrimination based on an unlawful discharge, "a plaintiff must demonstrate: '(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination.'" *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (quoting *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004)). CertainTeed's motion contests Mr. White's ability to satisfy the third element of his prima facie case. Doc. 38 at 38–40. A plaintiff may rely on "a variety of circumstances" to support an inference of discrimination, including "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus" and "preferential treatment given to employees outside the protected class." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). Mr. White relies on both types of circumstances.[14] But neither circumstance is supported by adequate evidence to allow a jury to conclude that CertainTeed terminated Mr. White's employment under circumstances giving rise to an inference of discrimination.

Mr. White seeks to rely on several statements and actions by CertainTeed managers that he argues establish racial animus on their part. But, a majority of Mr. White's purported evidence

---

[14]    Mr. White also argues that the timing of his termination vis-à-vis his efforts to wear a respirator mask supports a claim of race discrimination. Doc. 43 at 83. It is not, however, apparent how Mr. White's efforts to wear a respirator mask and his breathing condition can assist his claim for *race* discrimination. Mr. White's kitchen-sink approach to advancing his individual and distinct discrimination claims is not a productive one.

comes from the affidavits by Mr. Stallings, Mr. Jones, and Mr. Patterson. *See* Doc. 43 at 48–52

(Response to Summary Judgment, Plaintiff's Statement of Additional Uncontroverted Facts at

¶¶ 18–46). The court already has excluded those affidavits from consideration. *See supra.*

Section II.A.1. And, almost all of the evidence Mr. White offered through his own deposition is

either based on secondhand knowledge or speculation. In fact, the only episode of animus which

Mr. White has offered admissible testimony is Mr. Perrier calling an African-American employee

"boy," while poking the employee. But, even here, Mr. White's knowledge of the event is

secondhand, *i.e.*, it is inadmissible hearsay. Doc. 43-11 at 56–57 (White Dep. 215:8–217:15).

This contrasts with admissible testimony by Mr. Perrier, who denied that he called the employee

"boy." Doc. 43-19 at 9 (Perrier Dep. 29:21–32:6). So, Mr. White does not have any potentially

helpful, admissible evidence about this alleged incident. But, even assuming a jury might find

Mr. Perrier's denial not credible, this purported lone remark by a single CertainTeed manager is

insufficient to establish discriminatory animus. *See Cone v. Longmont United Hosp. Ass'n*, 14

F.3d 526, 531 (10th Cir. 1994) (collecting cases holding that single or stray remark is insufficient

to establish discriminatory animus by decisionmakers). In the end, Mr. White, by failing to

acquire and disclose admissible evidence from the employees who had firsthand knowledge of the

alleged racially charged incidents, has failed his summary judgment burden. He has not adduced

adequate evidence of discriminatory animus by CertainTeed's managers to permit an inference of

discrimination.

Next, Mr. White tries to compare himself to several Caucasian employees. Evidence of

"dissimilar treatment between similarly situated protected and non-protected employees may give

rise to an inference of discrimination." *English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1011

(10th Cir. 2001). "When comparing the relative treatment of similarly situated minority and non-

minority employees, the comparison need not be based on identical violations of identical work rules; however, the violations must be of comparable seriousness." *Id.* But, "[s]imilarly situated employees are those who deal with *the same supervisor* and are subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (emphasis added) (quotation marks omitted).

Mr. White's comparator evidence falls woefully short of this standard. Mr. White's Statement of Additional Uncontroverted Facts identifies ten employees whom Mr. White contends are similarly situated to him:

> Gerald Scott (cussing out employees), Terry Vice (mistreating employees), Darrell Wright (refused to stay over on a shift), Rick Crumly (stole copper), Roger Maxwell, Sr. (stealing), Lloyd Down, Dave Van Goethem (stealing), Roger Lankenau (called an African-American employee a monkey), John Duncan (threatened an African-American employee with a gun), and an unnamed package labeler (drugs).

Doc. 43 at 50 (Response to Summary Judgment, Statement of Additional Uncontroverted Facts at ¶ 35).

Four of these purported comparators did not work at CertainTeed's Kansas City plant while Mr. Perrier and Mr. Billings worked at the plant.[15] Mr. Perrier worked in Kansas City from 2013 until June 2017. Doc. 38-2 at 3 (Perrier Dep. 7:3–6). Mr. Billings served as the HR Manager for the plant from December 2015 through November 2016. Doc. 38-9 at 2 (Billings Decl. ¶ 3). But, according to Mr. White's deposition testimony, Mr. Scott, Mr. Vice, Mr. Maxwell, Mr. Down, Mr. VanGoethem, and Mr. Crumly all committed their purported infractions before 2013. Thus, these infractions happened before Mr. Perrier or Mr. Billings

---

[15] As for Mr. Weigert, the record does not reveal when Mr. Weigert started working at CertainTeed's Kansas City plant. But, Mr. Weigert stopped working at the plant by early spring 2016 (Doc. 38-4 at 4 (Barnes Dep. 12:1–16)), and Mr. White does not advance any evidence demonstrating that Mr. Weigert managed any of the individuals he identifies as comparators.

assumed their positions at CertainTeed.  Doc. 43-11 at 26–28 (White Dep. 94:13–22, 101:5–24, 102:19–103:8, 103:12–104:13).  Conversely, Mr. Wright and Mr. Duncan committed their purported infractions in 2018—after Mr. Perrier, Mr. Weigert, and Mr. Billings had departed their positions at CertainTeed's Kansas City plant.[16]  *Id.* at 30, 32 (White Dep. 110:24–111:1, 117:4–12).  And, Mr. White offers no evidence that any of these employees were managed by any of the managers who managed him.

Mr. White's arguments based on Mr. Lankenau and the unnamed package labeler won't suffice because Mr. White lacks any firsthand knowledge of their purported infractions.  *See id.* at 29 (White Dep. 108:15–21) (admitting he did not observe incident involving unnamed package labeler) *id.* at 30–31 (White Dep. 112:24–113:8) (admitting only secondhand knowledge of incident involving Mr. Lankenau).  Indeed, Mr. White does not identify any evidence to support his assertions that these individuals actually committed the infractions he attributes to them other than his own deposition testimony.  And in that testimony, he concedes that his "knowledge" about their infractions is entirely secondhand.  Also, Mr. White's secondhand account about Mr. Lankenau defeats his argument of disparate treatment.  While Mr. White testified that he did not think Mr. Lankenau received any formal discipline for using racially charged language, Mr. White acknowledged Mr. Lankenau received counseling.  *Id.* at 31 (White Dep. 114:8–18). Meanwhile, when Mr. White was accused of making sexually suggestive remarks about a female employee at CertainTeed, he received counseling, as opposed to discipline.  *Id.* at 10 (White Dep. 29:4–32:14).

Even assuming Mr. White's job performance issues and his removal of company documents from CertainTeed property are comparable to the infractions of the individuals he has

---

[16]    Incidentally, Mr. White admits Mr. Duncan received a suspension for his conduct.  Doc. 43-11 at 31–32 (White Dep. 116:21–117:3).

identified—an assumption the court doubts but needs not address—none of these individuals were treated differently by the decisionmakers who terminated Mr. White's employment. Having neither established discriminatory animus on the part of CertainTeed managers nor identified a similarly situated Caucasian employee who was disciplined differently, Mr. White fails to satisfy the third element of his prima facie case. The court, therefore, grants CertainTeed's Motion for Summary Judgment as to Count III.

### 6. Count IV – National Origin Discrimination Under Title VII

In Count IV, Mr. White asserts a claim for national origin discrimination under Title VII. Doc. 1 at 14–15 (Compl. at ¶¶ 103–08). Title VII prohibits employers from discriminating against an employee based on the employee's national origin. 42 U.S.C. § 2000e-2(a)(1). "Accompanying regulations define national-origin discrimination as 'the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.'" *Sidlo v. Millercoors, LLC*, 718 F. App'x 718, 726 (10th Cir. 2018) (quoting 29 C.F.R. § 1606.1). To establish a prima facie case of national origin discrimination based on termination, a plaintiff must prove (1) he "was of a protected national origin"; (2) he "was qualified to perform the job from which [he] was removed"; and (3) he "was discharged under circumstances giving rise to an inference of discrimination." *Metoyer v. Kan.*, 874 F. Supp. 1198, 1202 (D. Kan. 1995).

CertainTeed argues Mr. White has failed to satisfy the third element of his prima facie case. Mr. White contends that he can establish causation between his national origin and his discipline and termination based on CertainTeed managers (1) making derogatory comments about Americans and (2) speaking a foreign language when he approached them. As Mr. White

does not speak the language which Mr. Perrier and Mr. Weigert spoke, his assertion that they spoke ill of Americans when they spoke a foreign language is entirely speculative. It does not advance his claim.

Mr. White's attempt to prove discrimination based on comments by Mr. Perrier and Mr. Weigert presents a slightly closer question. If Mr. White had advanced admissible evidence about all the alleged comments, he might have established a jury question whether CertainTeed decisionmakers harbored animus toward Americans. But, Mr. White relies largely on secondhand accounts, irreducible to admissible testimony.[17] Mr. White's only admissible evidence consists of testimony from Mr. Billings, who testified about a single comment that suggests animus against Americans. Namely, Mr. Billings testified that he heard a manager call Americans "stupid" on a single occasion. *See* Doc. 43-6 at 17 (Billings Dep. 64:15–17). The Tenth Circuit repeatedly has held that a single, stray remark is insufficient to permit an inference of discrimination and create a jury issue in a Title VII discrimination case. *See Cone*, 14 F.3d at 531 (collecting cases). Because Mr. White's admissible evidence consists of exactly that—a single, stray remark—he has not sustained his prima facie burden for his national origin discrimination claim. The court thus grants summary judgment against Count IV's national origin claim.

---

[17] Mr. White heard these statements from other hourly employees and does not argue that the statements to him by other hourly employees are not hearsay under Rule 801(d)(2)(D). Nor could he under Tenth Circuit precedent. *See Ellis v. J.R.'s Cty. Stores, Inc.*, 779 F.3d 1184, 1202 (10th Cir. 2015) ("[U]nder our controlling precedent, an employee's statements are not attributable to her employer as a party-opponent admission in an employment dispute unless the employee was involved in the decisionmaking process affecting the employment action at issue. (quoting *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1208–09 (10th Cir. 2010))).

### 7.    Pretext as an Alternative Ground for Granting Summary Judgment on Discrimination Claims

Even if Mr. White had sustained his burden on his prima facie case for his disability, race, or national origin discrimination claims based on the Rule 9 write-ups and his termination, the court still would grant summary judgment against all those claims.  In response to Mr. White's allegations of discrimination, CertainTeed has provided legitimate nondiscriminatory reasons for the adverse employment actions relied on by Mr. White.  First, CertainTeed contends Mr. Perrier and Mr. Hughes held a good-faith belief that Mr. White neglected his job duties by failing to maintain and clean the washwater area.  Doc. 38 at 52–54.  To support this belief, CertainTeed has adduced admissible evidence in the form of pictures of the washwater area.  Doc. 38-3 at 14–18; Doc. 38-5 at 9; *see also* Doc. 43-44 at 2–4.  The summary judgment facts establish that these photographs were taken shortly after several of Mr. White's shifts and were attached to the e-mailed complaints Mr. Perrier and Mr. Hughes received from Shift D employees.  Doc. 38-3 at 14–18; Doc. 38-5 at 9; *see also* Doc. 43-44 at 2–4.  Second, CertainTeed contends Mr. White's retention of the check sheets after his initial termination justified his final termination in January 2016.  Doc. 38 at 55–56.  To support this reason, CertainTeed relies on Mr. Billings's statement about CertainTeed's protocol prohibiting employees from removing documents containing information about the plant production process.  Doc. 38-9 at 5 (Billings Decl. ¶ 23).

Because CertainTeed has advanced legitimate nondiscriminatory reasons for its adverse employment actions, the burden shifts back to Mr. White to establish that CertainTeed's reasons are a pretext contrived to conceal discrimination.  *Selenke*, 248 F.3d at 1259.  "A plaintiff may show pretext by demonstrating the 'proffered reason is factually false,' or that 'discrimination was a primary factor in the employer's decision.'"  *DePaula v. Easter Seals El Mirador*, 859

F.3d 957, 970 (10th Cir. 2017) (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013)). "This is often accomplished 'by revealing weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.'" *Id.* (quoting *Tabor*, 703 F.3d at 1216). In evaluating a plaintiff's pretext showing, a court "may not second guess the business judgment of the employer." *Id.* (quoting *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017)). "Evidence that the employer 'should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility.'" *Id.* at 970–71 (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169–70 (10th Cir. 2007)). And a court must examine the facts supporting the adverse employment action "as they appear[ed] *to the person making the decision*," asking whether the decisionmaker "honestly believed those reasons and acted in good faith upon those beliefs." *Id.* (emphasis in original) (first quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011), then quoting *Swackhammer*, 493 F.3d at 1170).

To meet his burden, Mr. White first relies on the evidence he advanced to show causation. *See* Doc. 43 at 71–72, 73 (identifying animus on the part of decisionmakers and differential treatment of African-Americans as bases for finding pretext). Mr. White's causation arguments, as discussed in this court's earlier analysis, are unsupported by admissible evidence. Thus, his causation arguments fail to establish pretext.

Next, Mr. White argues that CertainTeed's reason for issuing Rule 9 write-ups and terminating his employment are weak and inconsistent. *Id.* at 72–73. On the gravamen of his claim—his January 2016, final termination—Mr. White advances two arguments. First, he

contends that CertainTeed's proffered reason is weak because a former supervisor advised him to maintain his check sheets and Mr. Monroe knew he maintained check sheets. But the argument in Mr. White's memorandum only tells half the story. While CertainTeed permitted employees to maintain possession of check sheets *on* CertainTeed property, no supervisor gave Mr. White permission to take the sheets *off* CertainTeed property, particularly *after* CertainTeed initially terminated Mr. White. And, as Mr. White admitted during his deposition, he knew he could not take the check sheets off company property. *See* Doc. 38-7 at 7 (White Dep. 75:7–11) (Mr. White, in response and trying to explain why he kept the check sheets, stated: "I know you can't take company – off company property . . . ."). In sum, not objecting to Mr. White possessing check sheets *in* the plant does not weaken CertainTeed's decision to terminate Mr. White for removing the check sheets *from the plant*.

Second, Mr. White contends that even if CertainTeed had a protocol prohibiting employees from removing confidential documents from plant premises, the check sheets are not confidential because they were displayed within the plant and because they do not contain information about plant production. Doc. 43 at 72. That the check sheets may have been displayed within the plant says nothing about the confidentiality of the information on the check sheets. None of the evidence in the summary judgment record suggests CertainTeed exposed the interior of its plant to anyone but CertainTeed employees. And, reviewing the check sheets submitted by CertainTeed demonstrates that they do contain information about CertainTeed's production process. *See, e.g.*, Doc. 39-1 at 5 (listing machinery speeds and settings during production). This observation supports Mr. Billings's contention that he held a good-faith belief that Mr. White's possession of the check sheets off campus violated plant protocol and was grounds for termination

Turning to the Rule 9 write-ups and his initial termination in December 2015, Mr. White argues CertainTeed's reasons for these actions contain inconsistencies. First, Mr. White contends Mr. Monroe's statement that the plows, not the washwater system, prevented the K-21 line from starting on time on November 1, 2015, creates an inconsistency about Mr. Perrier's decision to issue Mr. White a Rule 9 write-up. At most, however, this evidence suggests Mr. Perrier might have reached the wrong conclusion when he assessed the cause of the delay in starting the K-21 line. But, evidence merely establishing a mistaken belief on the part of a decisionmaker does not establish pretext. *DePaula*, 859 F.3d at 970–71. Also, Mr. Perrier based his decision to issue Mr. White the November, Rule 9 write-up on complaints he received from Shift D employees. Mr. Monroe was not privy to those complaints. And, while Mr. White does not advance any argument against his two December 2015, Rule 9 write-ups, the undisputed photographic evidence supporting Mr. Perrier's decision compellingly depicts the washwater area in a neglected state of disarray. The pictures show what appears to be fiber scraps everywhere, including overflowing from bins under machinery. Here, the pictures nullify Mr. White's words, and they defeat any claim of pretext for the December 2015, Rule 9 write-ups. *Cf. Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (relying on video evidence to resolve dispute of fact at summary judgment and stating: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Second, Mr. White contends the basis for his initial termination suggests pretext because that termination later was deemed to violate the plant's progressive discipline policy. Doc. 43 at 72. Had CertainTeed stood by its initial decision to terminate Mr. White, Mr. White might have

a meritorious argument. But, upon learning of Mr. Billings's determination that the plant's discipline policy favored reinstating Mr. White, Mr. Perrier agreed with that outcome. Thus, at most, Mr. White demonstrates that Mr. Perrier was mistaken about how the plant disciplinary policy operated in the semi-unique situation where: (1) an employee receives two write-ups for the same rule violation on the same day; (2) the write-ups stem from incidents on different days; and (3) the two write-ups combine with an earlier write-up for a total of three write-ups within a nine-month period.[18] This subsequently-corrected mistaken application of the plant discipline policy does not suffice to establish pretext. *See DePaula*, 859 F.3d at 970–71 (evidence of mistake on part of decisionmaker does not establish pretext).

In conclusion, while the court already has decided to grant summary judgment against Mr. White's discrimination claims based on disability, race, and national origin at the prima facie stage because Mr. White did not advance evidence supporting the causation element, the court alternatively concludes that Mr. White has failed to adduce any admissible evidence supporting his burden at the pretext stage of the *McDonnell Douglas* framework. This holding provides a separate basis for granting summary judgment against those claims.

### 8.     Count V – Retaliation Under 42 U.S.C. § 1981[19]

Section 1981 of Title 42 "prohibits not only racial discrimination but also retaliation against those who oppose it." *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 355 (2013)).

---

[18]     The court says "at most" because Mr. White does not direct the court to anything in the Union's Collective Bargaining Agreement or the plant's disciplinary procedures addressing what happens if an employee receives two Rule 9 write-ups on the same day.

[19]     Count V of Mr. White's Complaint also raises a claim for retaliation under Title VII. CertainTeed argues dismissal is required because Mr. White failed to exhaust his administrative remedies. Doc. 38 at 27–33. Mr. White explicitly concedes this point and abandons this claim as unexhausted. *See* Doc. 43 at 74 ("Mr. White will abandon his Title VII retaliation claim which was not exhausted.").

And, unlike a Title VII retaliation claim, no administrative exhaustion requirement applies to claims brought under § 1981. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 455 (2008).

Where a plaintiff relies on circumstantial evidence to advance his claim, the *McDonnell Douglas* burden-shifting framework applies. *Parker Excavating, Inc.*, 863 F.3d at 1220. Under that framework, the initial burden is on the plaintiff to show that "(1) he engaged in opposition to racial discrimination that is protected under the statute; (2) a reasonable person would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the adverse action." *Id.* CertainTeed and Mr. White disagree when Mr. White first opposed alleged racial discrimination. Also, CertainTeed argues that Mr. White has not presented evidence supporting the third element of his prima facie case. To decide whether Mr. White satisfied his burden on the third element, the court first must determine when Mr. White initially opposed perceived race discrimination at CertainTeed.

Mr. White seemingly contends he engaged in three actions that qualify as protected opposition to race discrimination: (1) talking to other hourly employees about discrimination; (2) complaining to Mr. Monroe about discrimination; and (3) filing an EEOC charge. There is no dispute that the third act—filing an EEOC charge—qualifies as protected activity. *See Anderson*, 181 F.3d at 1178 ("By filing an EEOC claim, Plaintiff engaged in protected activity."). Neither one of Mr. White's other alleged actions, however, qualifies as a protected activity.

Discussing what will suffice as an act opposing discrimination, the Supreme Court has given the word "oppose" its dictionary definition: "to resist or antagonize . . .; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) (quoting Webster's New International Dictionary 1710 (2d ed.

41

1957)).  To oppose discrimination, an employee need not use any "magic words" but he "must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII or § 1981]."  *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (emphasis added).  In contrast, expressing generic dissatisfaction with a company's course of action won't do.  "General complaints about company management and one's own negative performance evaluation will not suffice."  *Id.*  Along those lines, "a vague reference to discrimination and harassment without any indication that this misconduct was motivated by race . . . does not constitute protected activity and will not support a retaliation claim."  *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004); *see also Petersen v. Utah Dep't of Corrs.*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("It therefore follows that [plaintiff's] superiors could not know that she was engaging in protected opposition unless they knew that her opposition was based (at least in part) on . . . bigoted motives.").

The content of an employee's complaint is not the only requisite for a complaint to qualify as an act opposing discrimination.  As *Hinds* recognized, the complaining employee must "convey [his opposition] to the employer."  523 F.3d at 1203.  Mr. White's communications to other hourly employees would not have placed CertainTeed's managers on notice of Mr. White's opposition to discrimination.[20]  These communications, thus, do not qualify as a protected activity for purposes of a retaliation claim.

Turning to Mr. White's communication with Mr. Monroe in November 2015, Mr. White used the word "harassment" in passing but he never identified any race-based motivation on the part of Mr. Perrier or any other CertainTeed manager.  Doc. 43-22 at 8 (Transcript of Audio

---

[20]    Certainly, the court can envision circumstances where statements opposing discrimination—though expressed just to non-management employees—could provide the predicate for a retaliation claim.  For example, where a retaliation plaintiff adduced admissible evidence that his opposition was relayed to management employees, albeit indirectly, that might satisfy *Hinds*.  But Mr. White hasn't advanced any such evidence here.

Recording at 25:16–24).  His complaint, therefore, was a general complaint insufficient to place

Mr. Monroe on notice that Mr. White sought to oppose race discrimination.  Nor could

Mr. Monroe have inferred that Mr. White's complaint about how he was treated compared to

other utility cullets was about race discrimination when the three other utility cullets on the K-21

line in 2015 were all African-American.  *See* Doc. 43-11 at 7 (White Dep. 20:11–19) (identifying

other three utility cullets as African-American).  And, any doubt about Mr. White's intent when

communicating with Mr. Monroe is resolved by Mr. White's own admission.  During his

deposition testimony, Mr. White conceded that he never complained of discrimination to any

CertainTeed manager and was, in fact, afraid to make a complaint.  *Id*. at 36, 38, 41 (White Dep.

148:11–23, 143:9–14, 154:18–25).

Following from the conclusion that Mr. White's only protected activity was the filing of

his EEOC charge, Mr. White can claim retaliation under § 1981 based only on CertainTeed's

actions after they learned of his EEOC charge.  Attempting to make his prima facie case for

retaliation, Mr. White identifies two actions that occurred after his EEOC charge:  (1)

CertainTeed advanced allegations against him at the arbitration hearing and (2) CertainTeed

undercalculated his back wages and did not make the payment in a timely manner.  Mr. White,

however, either is unable to connect his protected activity to CertainTeed's actions or fails to

advance specific proof about CertainTeed's actions.

On the first alleged act of retaliation, an arbitration hearing is an adversarial proceeding

where one would expect the parties to advance allegations against each other.  No reasonable

jury could find that CertainTeed's defense of its pre-EEOC charge position in an arbitration

proceeding *commenced by Mr. White* can support an inference of retaliatory motive.

On the second alleged act of retaliation, Mr. White fails to offer any evidence establishing that CertainTeed undercalculated his back wages. In fact, Mr. White never even identifies the amount he believes CertainTeed should have paid him. Mr. White thus has not demonstrated that CertainTeed's calculation of his back wages qualifies as an adverse action. Mr. White has established, however, that CertainTeed did not pay him the back wages in a timely manner, as ordered by the arbitrator. But, the four months between when CertainTeed learned of the EEOC charge and the deadline for the back-wage payment is too long for Mr. White to rely solely on temporal proximity to establish causation. *See Metzler*, 464 F.3d at 1172.

Even if Mr. White could make out a prima facie case, CertainTeed has offered a legitimate non-retaliatory reason for the delay. The summary judgment facts establish CertainTeed was in ongoing discussions with the Union between the date the payment was due under the arbitration ruling and the date CertainTeed made the payment. Docs. 38-24, 38-25. And, Mr. White fails to sustain his burden at the pretext stage by offering any evidence countering or undermining this explanation for the delay.

In sum, Mr. White has failed to shoulder his burden to show that he can establish a prima facie claim for retaliation under § 1981. The court thus sustains CertainTeed's Motion for Summary Judgment against the claim asserted in Count V.

### C.  Motion to Strike Plaintiff's Untimely Amended Rule 26 Disclosures

In its Motion to Strike Plaintiff's Untimely Amended Rule 26 Disclosures (Doc. 34), CertainTeed seeks to preclude Mr. White from relying on evidence from the witnesses not timely identified in a Federal Rule of Civil Procedure 26 disclosure. By excluding Exhibits 43-13, 43-16, and 43-17 from consideration, the court effectively struck the evidence before it on summary

judgment that came from the untimely disclosed witnesses. And, by granting CertainTeed's Motion for Summary Judgment, the court need not determine whether it should permit Mr. White to present evidence from the untimely disclosed witnesses at a trial that will not occur. The court thus denies CertainTeed's Motion to Strike Plaintiff's Untimely Amended Rule 26 Disclosures as moot.

**IT IS THEREFORE ORDERED BY THE COURT THAT** CertainTeed's Motion to Strike Plaintiff's Opposition Exhibits 13, 16, 17, 22, and 23 (Doc. 44) is granted in part and denied in part.

**IT IS FURTHER ORDERED BY THE COURT THAT** CertainTeed's Motion for Summary Judgment (Doc. 37) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** CertainTeed's Motion to Strike Plaintiff's Untimely Amended Rule 26 Disclosures (Doc. 34) is denied as moot.

**IT IS FURTHER ORDERED BY THE COURT THAT** the Clerk is directed to enter a judgment consistent with this Order and close this case.

**IT IS SO ORDERED.**

**Dated this 13th day of May, 2019, at Kansas City, Kansas.**

                                        **s/ Daniel D. Crabtree**
                                        **Daniel D. Crabtree**
                                        **United States District Judge**